## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **KELLIE SANCHEZ, KRISTIAN GRAVES, and KEVIN HAZURE, JR.** *individually and on behalf of all others similarly situated,* | **CIVIL ACTION** |
| | **NO.: 2:23-cv-01269-DJP-DPC** |
| **Plaintiffs,** | |
| **v.** | **JUDGE DARREL JAMES PAPILLION** |
| **XAVIER UNIVERSITY OF LOUISIANA** | **MAGISTRATE DONNA PHILLIPS CURRAULT** |
| **Defendant.** | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Kellie Sanchez, Kristian Graves, and Kevin Hazure, Jr. ("Plaintiffs") bring this First Amended Class Action Complaint against Defendant Xavier University of Louisiana ("Xavier" or "Defendant"), individually and on behalf of all others similarly situated ("Class Members"), and allege as follows:

## INTRODUCTION

1.       Xavier is a private college located in New Orleans, Louisiana. Defendant failed to implement and maintain reasonable data security measures. As a result, in November 2022, a well a well-known cybercriminal organization named Vice Society accessed and exfiltrated Plaintiffs' and Class Members' personally identifiable information ("PII"), including full names and Social Security numbers (the "Data Breach").

2.       Vice Society demanded that Xavier pay a ransom for the return of PII stolen in the Data Breach. Xavier refused to pay this ransom. As a result, Vice Society leaked Plaintiffs' and Class Members' PII on the dark web.

3.       Despite the now-certainty that PII stolen in the Data Breach will be used for harm, Defendant did not begin notifying victims of the Data Breach like Plaintiffs until February—long

after it understood the risk that Plaintiffs and Class Members faced. And when notifications were finally sent, Xavier omitted crucial information, such as the fact that it refused to pay a ransom, and as a result, Plaintiffs' and Class Members' PII was confirmed to be on the dark web.

4.      The Data Breach was conducted using foreseeable tactics that Xavier should have recognized and prevented. Just a couple months before the Data Breach, the Federal Bureau of Investigations ("FBI") and the Cybersecurity and Infrastructure Security Agency ("CISA") released a joint advisory specifically warning educational institutions like Xavier of Vice Society's techniques, along with information on how to prevent the success of such techniques.[1]

5.      Although Xavier has reprehensibly decided to keep many details of the Data Breach secret, the evidence available to date shows that it is more likely than not that Defendant failed to implement and maintain reasonable data security measures, including those listed in the Joint Advisory. For example, Defendant failed to properly encrypt or redact PII, maintained PII longer than it had a legitimate use, and failed to properly secure user credentials to internet facing applications on its network.

## PARTIES

### *Plaintiff Kellie Sanchez*

6.      Plaintiff Kellie Sanchez is a resident and citizen of New Orleans, Louisiana, where she intends to remain. Plaintiff was a student at Xavier more than 18 years ago. Plaintiff received a notice letter from Defendant dated February 2, 2023, informing her that her name and Social Security number were compromised in the Data Breach.

### *Plaintiff Kristian Graves*

---

[1] *See* Joint Cybersecurity Advisory, #StopRansomware: Vice Society (Sept. 6, 2022), located at https://www.cisa.gov/news-events/cybersecurity-advisories/aa22-249a-0 (last visited May 26, 2023).

7.     Plaintiff Kristian Graves is a resident and citizen of New Orleans, Louisiana, where she intends to remain. Plaintiff has been a student at Xavier since 2019. Plaintiff received a notice letter from Defendant dated February 2, 2023 informing her that her name and Social Security number were compromised in the Data Breach.

***Plaintiff Kevin Hazure, Jr.***

8.     Plaintiff Kevin Hazure, Jr. is a resident and citizen of Los Angeles, California, where he intends to remain. Plaintiff was a student at Xavier more than 12 years ago. Plaintiff received a notice letter from Defendant dated February 2, 2023, informing him that his name and Social Security number were compromised in the Data Breach.

***Defendant Xavier University of Louisiana***

9.     Xavier is a private university incorporated in the State of Louisiana and headquartered at 1 Drexel Drive, New Orleans, Louisiana 70125.

## JURISDICTION AND VENUE

10.     This Court has original subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d). First, because the matter in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs. Second, because this class action involves a putative class of over 100 members. And third, because there is sufficient diversity—while Defendant's principal place of business is in Louisiana, many Class Members, including Plaintiffs, are citizens of different states.

11.     This Court has general personal jurisdiction over Defendant because Defendant's principal place of business is in Louisiana, and Defendant regularly conducts business in Louisiana, and has a location in New Orleans, Louisiana.

12.     Venue is proper in this District under 28 U.S.C. § 1391(a)(2), 1391(b)(2), and 1391(c)(2) as a substantial part of the events giving rise to the claims emanated from activities within this District, Defendant conducts substantial business in this District, and Defendant is headquartered in New Orleans, Louisiana.

## FACTUAL ALLEGATIONS

### Background

13.     Plaintiffs and the Class Members, as current or former students, applicants, or employees of Xavier, reasonably relied (directly or indirectly) on this sophisticated higher education institution to keep their sensitive PII confidential; to maintain its system security; to use this information for business purposes only; and to make only authorized disclosures of their PII. People demand security to safeguard their PII, especially when Social Security numbers are involved as here.

14.     Xavier had a duty to adopt reasonable measures to protect Plaintiffs' and Class Members' PII from involuntary disclosure to third parties and as evidenced by the Data Breach, it failed to adhere to that duty.

### The Data Breach

15.     On or around November 22, 2022, Vice Society executed a foreseeable attack of Xavier's computer network that allowed it to steal the highly sensitive PII of at least 44,312 current and former students and employees.[2] Because "Vice Society is known to use phishing to gain initial access to victims' systems," it is believed that one of Defendant's employees affirmatively provided Vice Society with access to Defendant's network.[3]

---

[2] https://apps.web.maine.gov/online/aeviewer/ME/40/81b945be-3f23-4b12-9766-197b5c48aefa.shtml (last visited May 26, 2023).

[3] https://unit42.paloaltonetworks.com/vice-society-targets-education-sector/ (last visited May 26, 2023).

16.     Sample notice letters provided to several states attorneys general have stated that impacted PII included names and Social Security numbers.[4] However, there are reports that the PII compromised in the Data Breach also included information about payroll, personal finances, misconduct allegations, and disciplinary actions.[5]

17.     Vice Society demanded that Xavier pay a ransom for the return of its students' and employees' PII, but Xavier refused. As a result, Vice Society publicly leaked the PII on the dark web in an unencrypted and unredacted state.[6]

18.     Reports on this Data Breach have noted that the "dark web" is "an area of the internet that is not picked up by search engines. Any malicious actor on the dark web can download the stolen data for their own purposes, which can include selling it to others."[7]

19.     Experts commenting on this specific Data Breach have stated that "those affected could now be exposed to a range of identity-related fraud crimes."[8] Despite this risk, Defendant did not begin mailing notice letters to victims until February 2023. Moreover, the notice letters it provided to Plaintiffs and Class Members did not explain that PII from the Data Breach is now publicly available for access on the dark web.

20.     Despite downplaying the risk, the notice letters sent by Defendant made several "recommendation[s]" on how Plaintiffs and Class Members could mitigate the consequences of the Data Breach. For example, notice letters instructed Plaintiffs and Class Members to:

---

[4] https://ago.vermont.gov/document/02-02-2023-xavier-university-data-breach-notice-consumers; https://apps.web.maine.gov/online/aeviewer/ME/40/81b945be-3f23-4b12-9766-197b5c48aefa.shtml; https://oag.ca.gov/ecrime/databreach/reports/sb24-563055
[5] https://www.scmagazine.com/brief/ransomware/vice-society-claims-leak-of-stolen-xavier-university-data (last visited May 26, 2023).
[6] *Id.*
[7] https://www.govtech.com/education/higher-ed/ransomware-gang-says-it-leaked-data-from-xavier-university-students-staff (last visited May 26, 2023).
[8] *Id.*

Review Your Account Statements and Notify Law Enforcement of Suspicious Activity: As a precautionary measure, we recommend that you remain vigilant by reviewing your account statements and credit reports closely. If you detect any suspicious activity on an account, you should promptly notify the financial institution or company with which the account is maintained. You also should promptly report any fraudulent activity or any suspected incidence of identity theft to proper law enforcement authorities, your state attorney general, and/or the Federal Trade Commission (FTC).[9]

21.     Notice letters also informed Plaintiffs and Class Members that:

You have the right to put a security freeze on your credit file for up to one year at no cost. This will prevent new credit from being opened in your name without the use of a PIN number that is issued to you when you initiate the freeze. A security freeze is designed to prevent potential creditors from accessing your credit report without your consent. As a result, using a security freeze may interfere with or delay your ability to obtain credit. You must separately place a security freeze on your credit file with each credit reporting agency. In order to place a security freeze, you may be required to provide the consumer reporting agency with information that identifies you including your full name, Social Security number, date of birth, current and previous addresses, a copy of your state-issued identification card, and a recent utility bill, bank statement or insurance statement.[10]

22.     With its offer of credit and identity monitoring services to victims, Xavier is acknowledging that the impacted persons are subject to an imminent threat of identity theft and financial fraud as a result of its failure to protect the PII it collected and maintained.

***The Data Breach was a Foreseeable Risk of which Defendant was on Notice***

23.     It is well known that PII, including Social Security numbers, is an invaluable commodity and a frequent target of hackers. Moreover, this Data Breach was "part of an increasing trend of attacks against higher education."[11]

---

[9] https://ago.vermont.gov/document/02-02-2023-xavier-university-data-breach-notice-consumers; https://apps.web.maine.gov/online/aeviewer/ME/40/81b945be-3f23-4b12-9766-197b5c48aefa.shtml; https://oag.ca.gov/ecrime/databreach/reports/sb24-563055

[10] https://ago.vermont.gov/document/02-02-2023-xavier-university-data-breach-notice-consumers; https://apps.web.maine.gov/online/aeviewer/ME/40/81b945be-3f23-4b12-9766-197b5c48aefa.shtml; https://oag.ca.gov/ecrime/databreach/reports/sb24-563055

[11] https://www.govtech.com/education/higher-ed/ransomware-gang-says-it-leaked-data-from-xavier-university-students-staff (last visited May 26, 2023).

24.     "A total of 88 education sector organizations were impacted by ransomware in 2021: 62 school districts and the campuses of 26 colleges and universities. The attacks disrupted learning at 1,043 individual schools."[12]

25.     "The numbers were almost identical in 2020: 84 incidents impacting 58 districts, and 26 colleges and universities. The number of schools impacted was, however, significantly greater at 1,681. This means that the average number of schools impacted by each incident decreased from 20 in 2020 to only 12 in 2021 – perhaps signaling that, as with governments, larger organizations are using their larger budgets wisely."[13]

26.     At the time of the Data Breach, the specific threat posed by Vice Society was known, or should have been known, by Xavier. Experts have described Vice Society "as a second- or maybe third-tier group overall, compared to big names like LockBit, Hive, and Black Cat …."[14] "But the bulk of their victims are either in the education or health care sectors, and their attacks make up a significant chunk of the total known attacks in those categories for 2021 and 2022 …. They loom large in those two sectors."[15]

27.     At the time, Vice Society was in the midst of a spree using well documented techniques to target education providers like Xavier. As one publication noted in a report about the Data Breach, "Vice Society has carried out more than 100 cyber attacks around the world since it surfaced in mid-2021 …. About 40 of those attacks have targeted the education sector."[16]

---

[12]https://www.emsisoft.com/en/blog/40813/the-state-of-ransomware-in-the-us-report-and-statistics-2021/amp/ (last visited May 26, 2023).
[13] *Id.*
[14] https://www.wired.com/story/vice-society-ransomware-gang/ (last visited May 26, 2023)
[15] *Id.*
[16]https://www.govtech.com/education/higher-ed/ransomware-gang-says-it-leaked-data-from-xavier-university-students-staff (last visited May 26, 2023)

28.     Approximately two months before the Data Breach, "Vice Society attacked the Los Angeles Unified School District … and leaked 500 gigabytes of sensitive student data, according to Wired magazine."[17] "After the school system refused to pony up, [Vice Society] released the trove, which contained sensitive data of students who had attended LAUSD between 2013 and 2016, including their Social Security numbers, financial and tax information, health details, and even legal records. And as LAUSD set up a hotline for worried families and scrambled to deal with the fallout, the hacking group behind the attack moved on, seemingly without making any money off the incident."[18]

29.     "That attack prompted federal authorities to issue a warning that the group was primarily taking aim at schools."[19] Specifically, on September 8, 2022, the FBI and CISA released a joint advisory (the "Joint Advisory") detailing the risk posed by Vice Society to education providers, the common techniques employed by Vice Society, and mitigation measures known to prevent Vice Society attacks.[20]

### Defendant Failed to Implement & Maintain Reasonable Security

30.     As discussed above, the Joint Advisory details the specific methods of attack used by Vice Society, along with how to prevent them. Vice Society's techniques and methods are also well documented by commercial data security providers like Palo Alto Networks.[21]

---

[17] *Id.*

[18] How Vice Society Got Away With a Global Ransomware Spree (Oct. 20, 2022), https://www.wired.com/story/vice-society-ransomware-gang/ (last visited March 9, 2023).

[19] https://www.govtech.com/education/higher-ed/ransomware-gang-says-it-leaked-data-from-xavier-university-students-staff (last visited May 26, 2023)

[20] *See* Joint Cybersecurity Advisory, #StopRansomware: Vice Society (Sept. 6, 2022), located at https://www.cisa.gov/news-events/cybersecurity-advisories/aa22-249a-0 (last visited March 9, 2023)..

[21] *See* https://unit42.paloaltonetworks.com/vice-society-targets-education-sector/#post-125924-_sv2kf5ae0jei (last visited May 26, 2023).

31.     Specifically, "Vice Society actors likely obtain initial network access through compromised credentials by exploiting internet-facing applications."[22] Vice Society is also "known to use phishing to gain initial access to victims' systems."[23]

32.     CISA has also noted that the following practices are "exceptionally risky":

Use of known/fixed/default passwords and credentials in service of Critical Infrastructure and National Critical Functions is dangerous and significantly elevates risk to national security, national economic security, and national public health and safety. This dangerous practice is especially egregious in technologies accessible from the Internet.

The use of single-factor authentication for remote or administrative access to systems supporting the operation of Critical Infrastructure and National Critical Functions (NCF) is dangerous and significantly elevates risk to national security, national economic security, and national public health and safety. This dangerous practice is especially egregious in technologies accessible from the Internet.[24]

33.     Given that Vice Society likely effectuated the Data Breach through compromised user credentials, it is more likely than not that the "bad practices" identified by CISA were employed by Defendant at the time of the Data Breach.

34.     The access to and exfiltration of PII by Vice Society would not have occurred but for Defendant's failure to implement and maintain the data security measures discussed in the Joint Advisory and other advisory materials. Indeed, "Vice Society is, in many ways, an unremarkable ransomware gang."[25] Vice Society "relies on exploiting known vulnerabilities" for success. [26] Experts have referred to its methods of attack as "technically unremarkable"[27]

---

[22] *See* Joint Cybersecurity Advisory, #StopRansomware: Vice Society (Sept. 6, 2022), located at https://www.cisa.gov/news-events/cybersecurity-advisories/aa22-249a-0 (last visited May 26, 2023).

[23] https://unit42.paloaltonetworks.com/vice-society-targets-education-sector/ (last visited May 26, 2023).

[24] https://www.cisa.gov/stopransomware/bad-practices (last visited May 26, 2023).

[25] https://www.wired.com/story/vice-society-ransomware-gang/ (last visited May 26, 2023).

[26] *Id.*

[27] *Id.*

35.    Experts have noted that Vice Society is "a perfect example of the success of mediocrity in the ransomware ecosystem," and that there are "top-tier groups developing their own zero days and acting all polished and professional. But meanwhile, Vice Society is just chugging along, not really innovating, stealing tools from other folks, but they have just enough stability to launch attacks, get paid, keep moving."[28]

36.    Regardless of Xavier's failure to properly secure and monitor PII, Xavier was also grossly negligent in its decision to not properly encrypt or redact the PII in its possession, as well as its decision to hold PII for longer than it had a legitimate use. For example, Plaintiffs Sanchez and Hazure have not been affiliated with Xavier for over a decade. Yet, Xavier inexplicably decided to continue storing his and other Class Members' PII on its systems long after their affiliation with Xavier ended.

37.    Several best practices have been identified that at a minimum should be implemented by entities that store PII, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

38.    Other best cybersecurity practices that are standard in the data security industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

39.    Defendant failed to meet the minimum standards of any of the following

---

[28] *Id.*

frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

40.    These foregoing frameworks are existing and applicable industry standards in the debt collection industry, and Defendant failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the data breach.

41.    Defendant breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because Xavier failed to properly maintain and safeguard their computer systems and network. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a.   Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

    b.   Failing to adequately protect PII;

    c.   Failing to properly monitor their own data security systems for existing intrusions;

    d.   Failing to ensure that their vendors with access to their computer systems and data employed reasonable security procedures;

    e.   Failing to ensure the confidentiality and integrity of electronic PII it created, received, maintained, and/or transmitted;

    f.   Failing to implement technical policies and procedures for electronic information systems that maintain electronic PII to allow access only to those persons or software programs that have been granted access rights;

g.   Failing to implement policies and procedures to prevent, detect, contain, and correct security violations;

h.   Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports;

i.   Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PII;

j.   Failing to train all members of their workforces effectively on the policies and procedures regarding PII;

k.   Failing to render the electronic PII it maintained unusable, unreadable, or indecipherable to unauthorized individuals;

l.   Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

m.   Failing to adhere to industry standards for cybersecurity as discussed above; and,

n.   Otherwise breaching their duties and obligations to protect Plaintiffs' and Class Members' PII.

42.   Defendant negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' PII by allowing cyberthieves to access Defendant's online insurance application flow, which provided unauthorized actors with unsecured and unencrypted PII.

43.   Accordingly, as outlined below, Plaintiffs and Class Members now face a present, increased risk of fraud and identity theft. In addition, Plaintiffs and the Class Members lost the benefit of the bargain they made with Defendant.

***The Theft of PII Has Severe & Long-Lasting Consequences***

44.   The ramifications of Xavier's failure to keep Plaintiffs' and Class Members' PII

12

secure are long lasting and severe. Once PII is stolen, particularly Social Security numbers as here, fraudulent use of that information and damage to victims is likely to continue for years.

45.     The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[29]

46.     That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, take over victims' identities in order to engage in illegal financial transactions under the victims' names.

47.     Social Security numbers are the "secret sauce" that is "as good as your DNA to hackers." There are long-term consequences to data breach victims whose social security numbers are taken and used by hackers. Even if they know their Social Security numbers have been accessed, Plaintiffs and Class Members cannot obtain new numbers unless they become a victim of Social Security number misuse. Even then, the Social Security Administration has warned that "a new number probably won't solve all [] problems … and won't guarantee … a fresh start."

48.     Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give

---

[29] *See* U.S. Gov. Accounting Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (2007). Available at https://www.gao.gov/new.items/d07737.pdf (last visited May 26, 2023).

the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

49.     By failing to properly notify Plaintiffs and the Class Members of the Data Breach, Defendant exacerbated their injuries. Specifically, by depriving them of the chance to take speedy measures to protect themselves and mitigate harm, Defendant allowed their injuries to fester and the damage to spread.

50.     Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[30]

51.     In addition to opening new bank or payment card accounts, attackers can use an individual's Social Security number, in combination with information like names, addresses, dates of birth, and/or phone numbers, to bypass account security protocols and access an individual's existing bank and payment card accounts.[31]

---

[30] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed May 26, 2023).
[31] *See* https://reasonlabs.com/blog/7-things-hackers-can-do-with-your-stolen-social-security-number-and-6-ways-to-protect-it (last visited May 26, 2023);
https://www.moneytalksnews.com/slideshows/heres-what-hackers-can-do-with-your-social-security-number/ (last visited May 26, 2023).

52.    Trying to change or cancel a stolen Social Security number is incredibly difficult, if not impossible. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

53.    Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[32]

54.    PII can be used to distinguish, identify, or trace an individual's identity, such as their name and Social Security number. This can be accomplished alone, or in combination with other personal or identifying information that is connected or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.[33]

55.    It can take years for victims to notice their identity was stolen—giving criminals plenty of time to sell one's personal information to the highest bidder.

56.    Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired

---

[32]    Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited May 26, 2023).
[33]    *See* https://georgewbush-whitehouse.archives.gov/omb/memoranda/fy2007/m07-16.pdf (last visited May 26, 2023).

information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

57.     In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect."

58.     One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[34]

59.     With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

60.     The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it

---

[34] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm,* Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance- finn/ (last visited on May 26, 2023).

at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

61.     The existence and prevalence of "Fullz" packages means that the PII stolen from the data breach can easily be linked to the unregulated data (like phone numbers and emails) of Plaintiffs and the other Class Members.

62.     Thus, even if certain information (such as emails or telephone numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

63.     For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[35] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[36] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

64.     As demonstrated by the repeated attempts at identity theft and fraud that Plaintiffs have suffered, that is exactly what is happening to Plaintiffs and Class Members. And it is reasonable for any trier of fact, including this Court or a jury, to find that the stolen PII (of Plaintiffs

---

[35] *Identity Theft and Your Social Security Number*, Social Security Administration (2018) at 1. Available at https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited May, 26, 2023).
[36] *Id* at 4.

and the other Class Members) is being misused—and that such misuse is fairly traceable to Defendant's data breach.

65.     Responsible for handling highly sensitive personal information, Defendant knew or should have known the importance of safeguarding PII. Defendant also knew or should have known of the foreseeable consequences of a data breach. These consequences include the significant costs imposed on victims of the breach. Still, Defendant failed to take adequate measures to prevent the data breach.

66.     Because of Defendant's inadequate practices, the PII of Plaintiffs and Class Members was exposed to criminals. In other words, Defendant opened up, disclosed, and then exposed its PII to crooked operators and criminals. Such criminals engage in disruptive and unlawful business practices and tactics, like online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud)—all using stolen PII.

67.     Given the nature of Xavier's Data Breach it is foreseeable that the compromised PII has been or will be used by hackers and cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Plaintiffs' and Class Members' PII can easily obtain Plaintiffs' and Class Members' tax returns or open fraudulent credit card accounts in Class Members' names.

68.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, simple credit card information in a retailer data breach, because credit card victims can cancel or close credit and debit card accounts.[37] The information compromised in this Data Breach is impossible to "close" and

---

[37] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, Forbes, Mar 25, 2020, *available at*: https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1 (last accessed May 26, 2023).

difficult, if not impossible, to change (such as Social Security numbers).

69.     To date, Xavier has offered Plaintiffs and Class Members *only one or two years* of identity monitoring services from their discovery of the Data Breach to the Notice Letters. The offered services are inadequate to protect Plaintiffs and Class Members from the threats they face for years to come, particularly in light of the PII at issue here.

70.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Xavier's failure to implement or maintain adequate data security measures to protect PII that it maintained.

### *The Value of PII*

71.     Stolen personal information is one of the most valuable commodities on the information black market. According to Experian, a credit-monitoring service, stolen personal information can sell for over $1,000.00 (depending on the type of information).[38]

72.     The value of Plaintiffs' and Class Members' personal information on the black market is considerable. Stolen personal information trades on the black market for years, and criminals frequently post stolen PII openly and directly on various "dark web" internet websites. Thus, after charging a substantial fee, criminals make such stolen information publicly available.

73.     An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[39] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[40]

---

[38] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited May 26, 2023).
[39] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited May 26, 2023).
[40] *See* https://datacoup.com/ (last visited May 26, 2023).

74.    As a result of the Data Breach, Plaintiffs' and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its acquisition by cybercriminals. This transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the PII is likely readily available to others, and the rarity of the PII has been destroyed, thereby causing additional loss of value.

75.    This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[41]

### *Xavier Failed to Comply with FTC Guidelines*

76.    Federal and State governments have established security standards and issued recommendations to lessen the risk of data breaches and the resulting harm to consumers and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for business highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[42]

77.    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[43] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other

---

[41] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited May 26, 2023).
[42] Federal Trade Commission, *Start With Security, available at*: https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited May 26, 2023)
[43] 17 C.F.R. § 248.201 (2013).

information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[44]

78.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[45] The guidelines note businesses should protect the personal consumer and consumer information that they keep, as well as properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.

79.    The FTC recommends that companies verify that third-party service providers have implemented reasonable security measures.[46]

80.    The FTC recommends that businesses:

a.    Identify all connections to the computers where you store sensitive information.

b.    Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

c.    Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business.

d.    Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to

---

[44] *Id.*
[45] Federal Trade Commission, *Protecting Personal Information: A Guide for Business, available at*: https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business (last accessed May 26, 2023).
[46] FTC, *Start with Security*, *supra* note 59.

prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

e.  Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks

f.  Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet.

g.  Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

h.  Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

i.  Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large

amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

81.     The FTC has brought enforcement actions against businesses for failing to protect consumer and consumer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

82.     Because Class Members entrusted Xavier with their PII directly or indirectly through Xavier, Xavier had, and has, a duty to the Class Members to keep their PII secure.

83.     Plaintiffs and the other Class Members reasonably expected that when they provide PII to Xavier that such PII would be protected and safeguarded.

84.     Xavier was at all times fully aware of its obligation to protect the personal data of Students, including Plaintiffs and Class Members. Xavier was also aware of the significant repercussions if it failed to do so.

85.     Xavier's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential data—including Plaintiffs' and Class Members' full names, Social Security numbers, and other highly sensitive and confidential information—constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

### *Plaintiffs and Class Members Have Suffered Concrete Injury As A Result Of Defendant's Inadequate Security And The Data Breach It Allowed.*

86.     Plaintiffs and Class Members reasonably expected that Defendant would provide adequate security protections for their PII, and Class Members provided Defendant with sensitive personal information, including their Social Security numbers.

87.     Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to pay Defendant for their education, Plaintiffs and other Class Members reasonably understood and expected that their PII would be protected with data security, when in fact Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than what they reasonably expected. As such, Plaintiffs and the Class Members suffered pecuniary injury.

88.     Cybercriminals target and capture PII to exploit it; the Class Members are now, and for the rest of their lives will be, at a heightened risk of identity theft. Plaintiffs have also incurred (and will continue to incur) damages in the form of, *inter alia*, loss of privacy and costs of engaging adequate credit monitoring and identity theft protection services.

89.     The cybercriminals who targeted and obtained Plaintiffs' and Class Members' PII may exploit the information they obtained by selling the data in so-called "dark markets."  Having obtained these names, addresses, Social Security numbers, and other PII, cybercriminals can pair the data with other available information to commit a broad range of fraud in a Class Member's name, including but not limited to:

- obtaining employment;

- obtaining a loan;

- applying for credit cards or spending money;

- filing false tax returns;

- stealing Social Security and other government benefits; and

- applying for a driver's license, birth certificate, or other public document.

90.     In addition, if a Class Member's Social Security number is used to create false identification for someone who commits a crime, the Class Member may become entangled in the

criminal justice system, impairing the person's ability to gain employment or obtain a loan.

91.     As a direct and/or proximate result of Defendant's wrongful actions and/or inaction and the resulting Data Breach, Plaintiffs and the other Class Members have been deprived of the value of their PII, for which there is a well-established national and international market.

92.     Furthermore, certain PII has a long shelf-life because it contains different forms of personal information, it can be used in more ways than one, and it typically takes time for an information breach to be detected.[47]

93.     Accordingly, Defendant's wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiffs and Class Members at an imminent, immediate, and continuing increased risk of identity theft and identity fraud.[48]  Indeed, "[t]he level of risk is growing for anyone whose information is stolen in a data breach."[49]  Javelin Strategy & Research, a leading provider of quantitative and qualitative research, notes that "[t]he theft of SSNs places consumers at a substantial risk of fraud."[50]  Moreover, there is a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported.  Even data that have not yet been exploited by cybercriminals bears a high risk that the cybercriminals who now possess Class Members' PII will do so at a later date or re-sell it.

94.     As a result of the Data Breach, Plaintiffs and Class Members have already suffered

---

[47] *Id.*

[48] *Data Breach Victims More Likely To Suffer Identity Fraud*, INSURANCE INFORMATION INSTITUTE BLOG (Feb. 23, 2012), https://web.archive.org/web/20170228020506/http://www.iii.org/insuranceindustryblog/?m=201202 (last visited May 26, 2023).

[49] Susan Ladika, *Study: Data Breaches Pose A Greater Risk*, CREDITCARDS.COM (July 23, 2014), https://web.archive.org/web/20200311212052/http://www.creditcards.com/credit-card-news/data-breach-id-theft-risk-increase-study-1282.php (last visited May 26, 2023).

[50] THE CONSUMER DATA INSECURITY REPORT: EXAMINING THE DATA BREACH- IDENTITY FRAUD PARADIGM IN FOUR MAJOR METROPOLITAN AREAS, (*available at* https://web.archive.org/web/20220131125035if_/https://www.it.northwestern.edu/bin/docs/The ConsumerDataInsecurityReport_byNCL.pdf) (last accessed May 26, 2023).

damages.

### *Plaintiff Kellie Sanchez's Experience*

95.    Plaintiff Sanchez greatly values her privacy and is very careful with her PII. Plaintiff Sanchez stores any documents containing sensitive PII like her Social Security number in a safe and secure location or destroys such documents when they are no longer needed. Plaintiff Sanchez has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Moreover, Plaintiff Sanchez diligently chooses unique usernames and passwords for online accounts storing sensitive PII. When Plaintiff Sanchez does entrust a third-party with her PII, it is only because she understands such information will be reasonably safeguarded from foreseeable threats, and that she will be timely notified if her PII is exposed.

96.    Plaintiff Sanchez was a student at Xavier from 2003 to 2005. When enrolling, Plaintiff Sanchez provided PII, including her full name, date of birth, Social Security number, and phone number. Plaintiff Sanchez reasonably understood that Xavier would encrypt or redact highly sensitive information like her Social Security number, and that such PII would be deleted after Defendant no longer had a need for it related to her tenure as a student.

97.    Plaintiff Sanchez received a letter dated February 2, 2023 from Defendant notifying her of the Data Breach. The letter stated that Plaintiff's name and Social Security number were compromised in the Data Breach. The letter contained hardly any other information about the Data Breach. However, it recommended that Plaintiff Sanchez sign up for credit monitoring, spend time reviewing her accounts, and consider implementing other security measures, like a fraud alert or credit freeze.

98.    As a result of the Data Breach notice, Plaintiff Sanchez has spent significant time verifying the legitimacy of the Notice of Data Breach, reviewing her accounts, and reviewing credit

reports and financial account statements for indications of actual or attempted identity theft or fraud.

99.     As a result of the Data Breach, Plaintiff Sanchez has suffered actual fraud to her accounts.

100.     Plaintiff Sanchez recently had an unknown third party access her Amazon account using her identification and incur an unauthorized charge on her account. Plaintiff has filed a dispute with Amazon regarding this unauthorized charge but has not yet been refunded.

101.     Plaintiff Sanchez has spent significant time, money, and effort on an ongoing basis to try to mitigate and address the present and impending injuries caused by the Data Breach. The letter Plaintiff received encouraged her to take such steps.

102.     The Data Breach and exfiltration of Plaintiff Sanchez's PII has caused her to suffer a loss of privacy. This loss of privacy is analogous to the injury caused by the commission of well-recognized common law privacy torts like invasion of privacy.

103.     As a result of the Data Breach, Plaintiff Sanchez will face a substantial risk of imminent harm for the rest of her life.

104.     The fraud, loss of privacy, and substantial risk of harm that Plaintiff Sanchez faced and continues to face has caused Plaintiff Sanchez to suffer proportional fear, stress, anxiety, and nuisance.

105.     Plaintiff Sanchez has suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property Defendant was required to adequately protect.

106.     Plaintiff Sanchez has a continuing interest in ensuring that her Private Information, which upon information and belief, remains in Defendant's possession, is protected and

safeguarded from future breaches.

### *Plaintiff Kristian Graves' Experience*

107.    Plaintiff Graves greatly values her privacy and is very careful with her PII. Plaintiff Graves stores any documents containing sensitive PII like her Social Security number in a safe and secure location or destroys such documents when they are no longer needed. Plaintiff Graves has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Moreover, Plaintiff Graves diligently chooses unique usernames and passwords for online accounts storing sensitive PII. When Plaintiff Graves does entrust a third-party with her PII, it is only because she understands such information will be reasonably safeguarded from foreseeable threats, and that she will be timely notified if her PII is exposed.

108.    Plaintiff Graves has been a student at Xavier from 2019 to 2023. When enrolling, Plaintiff Graves provided PII, including her full name, date of birth, Social Security number, and phone number. Plaintiff Graves reasonably understood that Xavier would encrypt or redact highly sensitive information like her Social Security number.

109.    Plaintiff Graves received an email from the Office of the President on December 22, 2023 notifying students of the Data Breach and stating that "malicious actors claimed to have stolen personal information from students and employees during the event." Plaintiff Graves later receive a letter dated February 2, 2023 from Defendant further notifying her of the Data Breach. The letter stated that Plaintiff's name and Social Security number were compromised in the Data Breach, but contained hardly any other information about the Data Breach. However, it recommended that Plaintiff Graves sign up for credit monitoring, spend time reviewing her accounts, and consider implementing other security measures, like a fraud alert or credit freeze.

110.    As a result of the Data Breach notice, Plaintiff Graves has spent significant time

verifying the legitimacy of the Notice of Data Breach, reviewing her accounts, and reviewing credit reports and financial account statements for indications of actual or attempted identity theft or fraud.

111.    As a result of the Data Breach, Plaintiff Graves has suffered from the actual fraudulent misuse of her accounts.

112.    For example, Plaintiff Graves began receiving student-directed phishing emails soon after the Data Breach. Plaintiff Graves also had numerous unauthorized charges on her debit card following the Data Breach, causing her to have to spend time to get a new debit card.

113.    Plaintiff Graves has spent significant time, money, and effort on an ongoing basis to try to mitigate and address the present and impending injuries caused by the Data Breach. The letter Plaintiff received encouraged her to take such steps.

114.    The Data Breach and exfiltration of Plaintiff Graves's PII has caused her to suffer a loss of privacy. This loss of privacy is analogous to the injury caused by the commission of well-recognized common law privacy torts like invasion of privacy.

115.    As a result of the Data Breach, Plaintiff Graves will face a substantial risk of imminent harm for the rest of her life.

116.    The fraud, loss of privacy, and substantial risk of harm that Plaintiff Graves faced and continues to face has caused Plaintiff Graves to suffer proportional fear, stress, anxiety, and nuisance.

117.    Plaintiff Graves has suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property Defendant was required to adequately protect.

118.    Plaintiff Graves has a continuing interest in ensuring that her Private Information,

which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff Kevin Hazure's Experience*

119.    Plaintiff Hazure greatly values his privacy and is very careful with his PII. Plaintiff Hazure stores any documents containing sensitive PII like his Social Security number in a safe and secure location or destroys such documents when they are no longer needed. Plaintiff Hazure has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Moreover, Plaintiff Hazure diligently chooses unique usernames and passwords for online accounts storing sensitive PII. When Plaintiff Hazure does entrust a third-party with his PII, it is only because he understands such information will be reasonably safeguarded from foreseeable threats, and that he will be timely notified if his PII is exposed.

120.    Plaintiff Hazure was a student at Xavier from 2007 to 2010. When enrolling, Plaintiff Hazure provided PII, including his full name, date of birth, Social Security number, and phone number. Plaintiff Hazure reasonably understood that Xavier would encrypt or redact highly sensitive information like his Social Security number, and that such PII would be deleted after Defendant no longer had a need for it related to his tenure as a student.

121.    Plaintiff Hazure received a letter dated February 2, 2023, from Defendant notifying him of the Data Breach. The letter stated that Plaintiff's name and Social Security number were compromised in the Data Breach. The letter contained hardly any other information about the Data Breach. However, it recommended that Plaintiff Hazure sign up for credit monitoring, spend time reviewing his accounts, and consider implementing other security measures, like a fraud alert or credit freeze.

122.    However, because the notice letter was mailed to Plaintiff Hazure at the address

where he lived while attending Xavier between 2007-2010, Plaintiff Hazure did not learn about the Data Breach until his mother provided him with a copy of the letter in early March 2023.

123.    As a result of the Data Breach notice, Plaintiff Hazure has spent significant time verifying the legitimacy of the Notice of Data Breach, reviewing his accounts, and reviewing credit reports and financial account statements for indications of actual or attempted identity theft or fraud.

124.    As a result of the Data Breach, Plaintiff Hazure has suffered actual fraud to his accounts.

125.    Plaintiff Hazure had unauthorized hard inquiries on his credit report around the time of the data breach that caused his credit score to decrease approximately forty points. As a result of his credit score dropping, Plaintiff Hazure was denied credit.

126.    After the Date Breach, an unauthorized third party fraudulently signed up for an NBA League Pass subscription using Plaintiff's identification and credit card through Plaintiff's Apple television account.  Plaintiff has filed a dispute with Apple regarding this unauthorized charge but has not been refunded for the unauthorized charges.

127.    Plaintiff Hazure has also been made aware that unknown third parties have used his identification when staying at certain hotels.  Plaintiff Hazure has received email notifications from these hotels requesting that Plaintiff Hazure complete post-stay surveys about the hotel stays that Plaintiff Hazure did not take or authorize.

128.    Plaintiff Hazure has spent significant time, money, and effort on an ongoing basis to try to mitigate and address the present and impending injuries caused by the Data Breach. The letter Plaintiff received encourage him to take such steps.

129.    The Data Breach and exfiltration of Plaintiff Hazure's PII has caused him to suffer

a loss of privacy. This loss of privacy is analogous to the injury caused by the commission of well-recognized common law privacy torts like invasion of privacy.

130.     As a result of the Data Breach, Plaintiff Hazure will face a substantial risk of imminent harm for the rest of his life.

131.     The fraud, loss of privacy, and substantial risk of harm that Plaintiff Hazure faced and continues to face has caused Plaintiff Hazure to suffer proportional fear, stress, anxiety, and nuisance.

132.     Plaintiff Hazure has suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property Defendant was required to adequately protect.

133.     Plaintiff Hazure has a continuing interest in ensuring that his Private Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

134.     Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

135.     Plaintiffs propose the following Nationwide Class definition, subject to amendments as appropriate.

> **All persons residing in the United States who received notice from Defendant that their PII may have been compromised in the Data Breach.**

136.     Plaintiffs also seek to represent subclasses of California and Louisiana residents, defined as:

> **California Subclass**
> **All persons residing in California who received notice from Defendant**

that their PII may have been compromised in the Data Breach.

**Louisiana Subclass**
**All persons residing in Louisiana who received notice from Defendant**
**that their PII may have been compromised in the Data Breach.**

137.    Excluded from the Classes are the following individuals and/or entities: Xavier, and Xavier's parents, subsidiaries, affiliates, officers and directors, and any entity in which Xavier has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

138.    Plaintiffs reserve the right to modify or amend the definition of the proposed classes and any future subclasses before the Court determines whether certification is appropriate.

139.    <u>Numerosity</u>. The Members of the Classes are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, based on information and belief, the Classes consist of more than 44,000 individuals whose sensitive data was compromised in Data Breach.

140.    <u>Commonality</u>. There are questions of law and fact common to the Classes, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

     a.   Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' PII;

     b.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information

compromised in the Data Breach;

c.  Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.  Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.  Whether Defendant owed a duty to Class Members to safeguard their PII;

f.  Whether Defendant breached its duty to Class Members to safeguard their PII;

g.  Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

h.  Whether Defendant should have discovered the Data Breach sooner;

i.  Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j.  Whether Defendant's conduct was negligent;

k.  Whether Defendant breach implied contracts with Plaintiffs and Class Members;

l.  Whether Defendant was unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiffs and Class Members;

m.  Whether Defendant failed to provide notice of the Data Breach in a timely manner, and;

n.  Whether Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

141.  <u>Typicality</u>. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' PII, like that of every other Class Member, was compromised in the Data Breach.

142.  <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and

protect the interests of the Class Members. Plaintiffs' counsel are competent and experienced in litigating class actions.

143.    <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the Plaintiffs' and Class Members' data was stored on the same computer system and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

144.    <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

145.    Defendant has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

146.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure

to afford relief to Plaintiffs and Class Members for the wrongs alleged because Xavier would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

147.    The litigation of the claims brought herein is manageable. Xavier's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

148.    Adequate notice can be given to Class Members directly using information maintained in Xavier's records.

149.    Unless a Class-wide injunction is issued, Xavier may continue in its failure to properly secure the PII of Class Members, Xavier may continue to refuse to provide proper notification to Class Members regarding the Data Breach, the PII Xavier continues to maintain will remain at risk of future breach, and Xavier may continue to act unlawfully as set forth in this Amended Complaint.

150.    Further, Xavier has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive relief with regard to the Class Members as a whole is appropriate.

151.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification

because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

b. Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether an implied contract existed between Defendant on the one hand, and Plaintiffs and Class Members on the other, and the terms of that implied contract;

e. Whether Defendant breached the implied contract;

f. Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their PII had been compromised;

g. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiffs' and Class Members' PII; and/or

i. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

**<u>COUNT I</u>**
**NEGLIGENCE**
**(On Behalf of Plaintiffs and All Class Members)**

152.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in the preceding paragraphs.

153.    Plaintiffs and Class Members entrusted their PII to Defendant. Defendant owed to Plaintiffs and other Class Members a duty to exercise reasonable care in handling and using the PII in its care and custody, including implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that came to pass, and to promptly detect attempts at unauthorized access.

154.    Defendant owed a duty of care to Plaintiffs and Class Members because it was foreseeable that Defendant's failure to adequately safeguard their PII in accordance with industry standards concerning data security would result in the compromise of that PII —just like the Data Breach that ultimately came to pass. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' PII by disclosing and providing access to this information to third parties and by failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

155.    Defendant owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the data breach. This duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the data breach.

156.    Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable classes of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security

protocols. Defendant actively sought and obtained Plaintiffs' and Class Members' PII.

157.    The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant holds vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII—whether by malware or otherwise.

158.    PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiffs and Class Members and the importance of exercising reasonable care in handling it.

159.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiffs and Class Members—which actually and proximately caused the Data Breach and injured Plaintiffs and Class Members.

160.    As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

161.    Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the data breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## COUNT II
## INVASION OF PRIVACY
### (On Behalf of Plaintiffs and All Class Members)

162.     Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in the preceding paragraphs.

163.     Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

164.     Defendant owed a duty to Plaintiffs and Class Members to keep this information confidential.

165.     Vice Society is known to use phishing to gain initial access to victims' systems. Accordingly, it is more likely than not that one of Defendant's employees recklessly and affirmatively provided Vice Society with access to Plaintiffs' and Class Members' PII in response to rudimentary phishing communications.

166.     The access that Vice Society was granted to Plaintiffs' and Class Members' PII is highly offensive to a reasonable person.

167.     The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs and Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

168.     The data breach constitutes an intentional interference with Plaintiffs and Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

169.     Defendant acted with a knowing state of mind when it permitted the data breach because it knew its information security practices were inadequate.

170.    Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and Class Members.

171.    As a proximate result of Defendant's acts and omissions, the private and sensitive PII of Plaintiffs and the Class was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and Class Members to suffer damages.

172.    Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and Class Members since their PII is still maintained by Defendant with its inadequate cybersecurity system and policies.

173.    Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard their PII.

174.    In addition to injunctive relief, Plaintiffs, on behalf of herself and the other Class Members, also seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

175.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and All Class Members)**

176.     Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in the preceding paragraphs.

177.     Plaintiffs' and Class Members' PII was provided to Defendant as part of education services or employment that Defendant provided to Plaintiffs and Class Members.

178.     Plaintiffs and Class Members agreed to pay Defendant tuition for education and administration services. Additionally, applicants for admission or employment agreed to provide their PII in exchange for Defendant's promise to keep it safe from unauthorized access.

179.     Defendant and Plaintiffs and Class Members entered into implied contracts for the provision of adequate data security, separate and apart from any express contracts concerning the security of Plaintiffs' and Class Members' PII, whereby, Defendant was obligated to take reasonable steps to secure and safeguard Plaintiffs' and Class Members' PII.

180.     Defendant had an implied duty of good faith to ensure that the PII of Plaintiffs and Class Members in its possession was only used in accordance with its contractual obligations.

181.     Defendant was therefore required to act fairly, reasonably, and in good faith in carrying out its contractual obligations to protect the confidentiality of Plaintiffs' and Class Members' PII and to comply with industry standards and applicable laws and regulations for the security of this information.

182.     Defendant breached the implied contracts by failing to take adequate measures to protect the confidentiality of Plaintiffs' and Class Members' PII, resulting in the Data Breach.

183.     The Data Breach was a reasonably foreseeable consequence of Defendant's actions in breach of these contracts.

184.     As a result of Defendant's conduct, Plaintiffs and Class Members did not receive the full benefit of the bargain.

185.    Had Defendant disclosed that its data security was inadequate, neither Plaintiffs or Class Members, nor any reasonable person would have entered into such contracts with Defendant.

186.    As a result of Data Breach, Plaintiffs and Class Members suffered actual damages resulting from the theft of their PII, as well as the loss of control of their PII, and remain at present risk of suffering additional damages.

187.    Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach, including the loss of the benefit of the bargain.

## COUNT IV
### VIOLATIONS OF LOUISIANA'S UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### La. Rev. Stat. Ann. §§ 51-1401, *et seq.*
### (On Behalf of Plaintiffs Sanchez, Graves and the Louisiana Subclass)

188.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in the preceding paragraphs.

189.    Plaintiffs Sanchez, Graves, Louisiana Subclass Members, and Defendant are "persons" within the meaning of the La. Rev. Stat. Ann. § 51:1402(8).

190.    Plaintiffs and Louisiana Subclass Members are "consumers" within the meaning of La. Rev. Stat. § 51:1402(1).

191.    The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. Ann. § 51:1405(A). Unfair acts are those that offend established public policy, while deceptive acts are practices that amount to fraud, deceit, or misrepresentation.

192.    Defendant participated in unfair and deceptive acts and practices that violated the Louisiana CPL, including:

a.   Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs and Louisiana Subclass Members, which were direct and proximate causes of the Data Breach;

b.   Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures, which were direct and proximate causes of the Data Breach;

c.   Failing to comply with common law and statutory duties pertaining to the security of Plaintiffs' and Louisiana Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which were direct and proximate causes of the Data Breach;

d.   Misrepresenting that Defendant would protect the privacy and confidentiality of Plaintiffs' and Louisiana Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

e.   Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs and Louisiana Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f.   Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs' and Louisiana Subclass Members' Private Information; and

g.   Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of

Plaintiffs' and Louisiana Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

193.     Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of its data security and ability to protect the confidentiality of consumers' Private Information.

194.     Defendant misled Plaintiffs and Louisiana Subclass Members and induced them to rely on its misrepresentations and omissions.

195.     Defendant's unfair acts and practices were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs and Louisiana Subclass Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

196.     Defendant acted intentionally, knowingly, and maliciously to violate Unfair Trade Practices and Consumer Protection Law, and recklessly disregarded Plaintiffs and Louisiana Subclass Members' rights.

197.     Had Defendant disclosed to Plaintiffs and Louisiana Subclass Members that its data systems were not secure and, thus, vulnerable to attack, Defendant would have been unable to continue its business and would have been forced to adopt reasonable data security measures and comply with the law. Instead, Defendant accepted the role of "steward of the data" while keeping its inadequate state of its security controls secret from the public. Accordingly, because Defendant held itself as having a special role as a provider of educational services, with corresponding duty of trustworthiness and care, Plaintiffs and Louisiana Subclass Members acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

198.    As a direct and proximate result of Defendant's unfair acts and practices, Plaintiffs and Louisiana Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money and property, and monetary and non-monetary damages, including from the fraud and / or identity theft they have already experienced and are at risk of experiencing again; time and expenses related to monitoring their financial accounts for fraudulent activity; increased, imminent risk of fraud and identity theft; and loss of value of Private Information.

199.    Plaintiffs and Louisiana Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages; treble damages for Defendant's knowing violations of the Louisiana CPL; declaratory relief; attorneys' fees; and any other relief that is just and proper.

**COUNT V**
**VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code § 17200, *et seq*.**
**(On Behalf of Plaintiff Hazure and the California Subclass Members)**

200.    Plaintiff Hazure re-alleges and incorporates by reference herein all of the allegations contained in the preceding paragraphs.

201.    By reason of the conduct alleged herein, Defendant engaged in unlawful and unfair business practices within the meaning of California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200, et seq.

202.    Defendant stored the PII of Plaintiff and Subclass Members in its computer systems.

203.    Defendant knew or should have known it did not employ reasonable, industry standard, and appropriate security measures that complied with California and federal statutes and regulations that would have kept Plaintiff's and Subclass Members' PII secure and prevented the loss or misuse of that PII.

*Unlawful Business Practices*

204.    Defendant engaged in unlawful business acts and practices by failing to establish adequate security practices and procedures as set forth above, by soliciting and gathering the PII of Plaintiffs and the Subclass knowing that the information would not be adequately protected, and by storing the PII of Plaintiffs and the Subclass in an unsecure electronic network, all in violation of California's data breach statute, Cal. Civ. Code § 1798.81.5, which requires Defendant to undertake reasonable measures to safeguard the PII of Plaintiff and the Subclass. Defendant's conduct also violated Section 5 of the FTC Act, as described above.

205.    Plaintiff and Subclass Members suffered injury in fact and lost money, or property as the result of Defendant's unlawful business practices. In addition, Plaintiff's and Subclass Members' PII was taken and is in the hands of those who will use it for their own advantage, or is being sold for value, making it clear that the hacked information is of tangible value. Plaintiff and Subclass Members have also suffered consequential losses of time and monetary losses procuring credit freeze or protection services, identity theft monitoring, and other expenses relating to identity theft losses or protective measures.

*Unfair Business Practices*

206.    Defendant engaged in unfair business practices under the "balancing test." The harm caused by Defendant's actions and omissions, as described in detail above, greatly outweigh any perceived utility. Indeed, Defendant's failure to follow basic data security protocols and failure to disclose inadequacies of Defendant's data security cannot be said to have had any utility at all. All of these actions and omissions were clearly injurious to Plaintiff and Subclass Members, directly causing the harms alleged below.

207.     Defendant engaged in unfair business practices under the "tethering test."
Defendant's actions and omissions, as described in detail above, violated fundamental public
policies expressed by the California Legislature. See, e.g., Cal. Civ. Code § 1798.1 ("The
Legislature declares that . . . all individuals have a right of privacy in information pertaining to
them . . . The increasing use of computers . . . has greatly magnified the potential risk to individual
privacy that can occur from the maintenance of personal information."); Cal. Civ. Code §
1798.81.5(a) ("It is the intent of the Legislature to ensure that personal information about
California residents is protected."); Cal. Bus. & Prof. Code § 22578 ("It is the intent of the
Legislature that this chapter [including the Online Privacy Protection Act] is a matter of statewide
concern."). Defendant's acts and omissions thus amount to a violation of the law.

208.     Plaintiff and Subclass Members suffered injury in fact and lost money or property
as the result of Defendant's unfair business practices. Plaintiff and Subclass Members' PII was
taken and is in the hands of those who will use it for their own advantage, or is being sold for
value, making it clear that the hacked information is of tangible value. Plaintiff and Subclass
Members have also suffered consequential losses of time and monetary losses procuring credit
freeze or protection services, identity theft monitoring, and other expenses relating to identity theft
losses or protective measures.

209.     As a result of Defendant's unlawful and unfair business practices in violation of the
UCL, Plaintiff and Subclass Members are entitled to damages, injunctive relief, and reasonable
attorneys' fees and costs.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class Members, request
judgment against the Xavier and that the Court grant the following:

A.    For an Order certifying the Class and appointing Plaintiffs and his Counsel to represent the Classes;

B.    For equitable relief enjoining Xavier from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' PII, and from refusing to issue prompt, complete, any accurate disclosures to the Plaintiffs and Class Members;

C.    For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

    i.    prohibiting Xavier from engaging in the wrongful and unlawful acts described herein;

    ii.    requiring Xavier to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

    iii.    requiring Xavier to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Xavier can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

    iv.    requiring Xavier to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the personal identifying information of Plaintiffs' and Class Members' personal identifying information;

    v.    prohibiting Xavier from maintaining Plaintiffs' and Class Members' personal

identifying information on a cloud-based database;

vi.   requiring Xavier to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Xavier's systems on a periodic basis, and ordering Xavier to promptly correct any problems or issues detected by such third-party security auditors;

vii.   requiring Xavier to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.   requiring Xavier to audit, test, and train its security personnel regarding any new or modified procedures;

ix.   requiring Xavier to segment data by, among other things, creating firewalls and access controls so that if one area of Xavier's network is compromised, hackers cannot gain access to other portions of Xavier's systems;

x.   requiring Xavier to conduct regular database scanning and securing checks;

xi.   requiring Xavier to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xii.   requiring Xavier to conduct internal training and education routinely and continually, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a

breach;

xiii.  requiring Xavier to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Xavier's policies, programs, and systems for protecting personal identifying information;

xiv.  requiring Xavier to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Xavier's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.  requiring Xavier to meaningfully educate all class members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi.  requiring Xavier to implement logging and monitoring programs sufficient to track traffic to and from Xavier's servers;

xvii.  for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Xavier's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment; and

D.  For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

E.      For an award of punitive damages;

F.      For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

G.      For prejudgment interest on all amounts awarded; and

H.      Such other and further relief as this Court may deem just and proper.


## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand that this matter be tried before a jury.


Date: October 19, 2023


                              Respectfully Submitted,

                              */s/ Jon S. McGill Sr.*
                              Jon S. McGill Sr.
                              **JSM LAW**
                              500 Lafayette Street
                              Gretna, LA 70053
                              Tel: (504) 208-5551
                              E: jon@jonsmcgilllaw.com

                              Mason A. Barney
                              Tyler J. Bean
                              **SIRI & GLIMSTAD LLP**
                              745 Fifth Avenue, Suite 500
                              New York, NY 10151
                              Tel: (212) 532-1091
                              E: mbarney@sirillp.com
                              E: tbean@sirillp.com

                              Andrew A. Lemmon (LA Bar No. 18302)
                              **MILBERG COLEMAN BRYSON**
                              **PHILLIPS GROSSMAN, PLLC**
                              5301 Canal Boulevard, Suite A
                              New Orleans, Louisiana 70124
                              Tel.: (985)783-6789
                              Email: alemmon@milberg.com

Gary M. Klinger*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel.: (866) 252-0878
Email: gklinger@milberg.com

Terence R. Coates*
Justin C. Walker*
Dylan J. Gould*
**MARKOVITS, STOCK & DEMARCO, LLC**
119 E. Court Street, Suite 530
Cincinnati, OH 45202
Phone: (513) 651-3700
Fax: (513) 665-0219
*tcoates@msdlegal.com*
*jwalker@msdlegal.com*
*dgould@msdlegal.com*

*Attorneys for Plaintiffs and the Proposed Class*

*\*pro hac vice applications forthcoming*

## CERTIFICATE OF SERVICE

I certify that on the 19th day of October, 2023, the foregoing document was filed electronically with the Clerk of Court using the Court's CM/ECF system. Notice of this filing will be sent to counsel for all parties by operation of the CM/ECF system.

/s/ Jon S. McGill Sr.
Jon S. McGill Sr.